UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

PAUL CATALDO,                                 )
                                              )
                        Petitioner,           )        Case No. 1:03-cv-519
                                              )
v.                                            )        Honorable David W. McKeague
                                              )
JOHN CASON,                                   )
                                              )        **REPORT AND RECOMMENDATION**
                        Respondent.           )
_____       )

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving a term of 15 to 40 years, imposed by the Osceola County Circuit Court on April 19, 1999, after a jury convicted Petitioner of forgery, MICH. COMP. LAWS § 750.248, as a fourth felony offender, MICH. COMP. LAWS § 769.12. In his *pro se* petition, Petitioner raises twelve multi-part grounds for relief, as follows:

I.      WHETHER THE TRIAL COURT DENIED PETITIONER HIS 6TH AMENDMENT "RIGHT TO COUNSEL" DURING "CRITICAL STAGES" OF THE TRIAL MECHANISM, RESULTING IN A "CONSTRUCTIVE DENIAL OF COUNSEL", WHICH VIOLATED PETITIONER'S DUE PROCESS RIGHTS UNDER THE 14TH AMENDMENT?

II.     WHETHER PETITIONER WAS DENIED HIS 6TH AMENDMENT RIGHT TO COMPULSORY PROCESS GUARANTEED BY THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT THROUGH THE ACTIONS OF THE PROSECUTOR AND DEFENSE COUNSEL, WHICH DROVE A KEY DEFENSE RES GESTAE WITNESS FROM THE WITNESS STAND?

III.    (1) WHETHER PETITIONER WAS DENIED HIS 6TH AND 14TH AMENDMENT RIGHTS BY THE PROSECUTOR'S USE OF FALSE AND MISLEADING STATEMENTS OF FACT OBTAINED THROUGH

EXPERT WITNESS TESTIMONY, (2) WHETHER PETITIONER WAS DENIED DUE PROCESS UNDER THE 14TH AMENDMENT BY THE PROSECUTOR'S EGREGIOUS MISCONDUCT, AND FALSE AND MISLEADING FINDINGS OF FACT, (3) WHETHER PETITIONER WAS DENIED HIS 6TH AND 14TH AMENDMENT RIGHTS THROUGH DEFENSE COUNSELS [SIC] FAILURE TO OBTAIN THE PRESENCE OF RES GESTAE WITNESSES, (4) WHETHER PETITIONER WAS DENIED HIS 6TH AND 14TH AMENDMENT RIGHTS WHEN COUNSEL FAILED TO OBTAIN THE PRESENCE OF AN EXPERT WITNESS, (5) WHETHER PETITIONER WAS DENIED HIS 6TH AND 14TH AMENDMENT RIGHTS WHEN COUNSEL FAILED TO OBJECT TO THE PROSECUTORS WITHHOLDING OF BRADY EVIDENCE, AND (6) WHETHER PETITIONER WAS DENIED HIS 4TH; 5TH; 6TH; 8TH AND 14TH AMENDMENT RIGHTS WHEN THE TRIAL COURT FAILED TO PRODUCE AN INDEPENDENT EXPERT WITNESS AFTER THE JURY REQUESTED SAME?

IV.     WHETHER THE TRIAL COURT DENIED PETITIONER DUE PROCESS UNDER THE 4TH: 5TH; 6TH; 8TH AND 14TH AMENDMENTS WHERE IT, (1) REFUSED TO INSTRUCT ON LESSOR INCLUDED OFFENSES, (2) FAILED TO GIVE AN INSTRUCTION OF "USE OF CHARACTER EVIDENCE", (3) BREACHED THE STIPULATED JURY INSTRUCTION BY GIVING AN INSTRUCTION THAT STATED THE PROSECUTOR'S "THEORY" ONLY, WHICH IT REITERATED TO THE JURY DURING JURY DELIBERATIONS?

V.      WHETHER THE TRIAL COURT DENIED PETITIONER COMPULSORY PROCESS, AND THE 6TH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, GUARANTEED THROUGH THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT WHEN IT REFUSED TO ALLOW PETITIONER A "CONTINUANCE" TO OBTAIN THE PRESENCE OF HIS (4) ENDORSED RES GESTAE WITNESSES?

VI.     WHETHER THE TRIAL COURT DENIED PETITIONER THE 6TH AMENDMENT RIGHT TO AN IMPARTIAL JURY, GUARANTEED BY THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT, THROUGH ITS EX PARTE COMMUNICATIONS DURING JURY DELIBERATIONS?

VII.    WHETHER PETITIONER WAS DENIED HIS 6TH AMENDMENT RIGHT TO A JURY TRIAL GUARANTEED BY THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT WHEN THE PROSECUTOR FAILED TO PROVE HIS CASE BEYOND A REASONABLE DOUBT?

VIII.   WHETHER TRIAL COUNSEL DENIED PETITIONER HIS 6TH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT, DUE TO A "CONFLICT OF INTEREST, WHICH RESULTED IN THE FAILURE TO FILE ANY POST-TRIAL MOTIONS?

IX.   WHETHER THE TRIAL COURT IN CONJUNCTION WITH THE X-PROSECUTOR [SIC] PENALIZED PETITIONER UNDER THE 8TH AMENDMENT FOR EXERCISING HIS RIGHT TO "TRIAL BY JURY", GUARANTEED THROUGH THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT?

X.   WHETHER THE TRIAL COURT VIOLATED PETITIONER'S 4TH, 5TH; 6TH AND 8TH AMENDMENT RIGHTS GUARANTEED BY THE DUE PROCESS CLAUSE OF THE 14 AMENDMENT WHEN IT SENTENCED PETITIONER BASED ON INACCURATE INFORMATION?

XI.   WHETHER THE TRIAL COURT DENIED PETITIONER HIS 6TH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED UNDER THE DUE PROCESS CLAUSE OF THE 5TH AND 14TH AMENDMENT?

XII.   WHETHER PETITIONER WAS DENIED HIS RIGHTS UNDER THE 1ST; 4TH; 5TH; 6TH, AND 8TH AMENDMENTS GUARANTEED UNDER THE DUE PROCESS CLAUSE OF THE 5TH AND 14TH AMENDMENTS DUE TO THE "CUMULATIVE ERROR" THAT INFECTED THE CRIMINAL PROCEEDINGS, WHICH "PREJUDICED" PETITIONER AND "CAUSED" A MISCARRIAGE OF JUSTICE?

Respondent has filed an answer to the petition (docket #46) stating that the grounds should be denied because they are without merit or procedurally defaulted. Upon review and applying the AEDPA standards, I find that all of Petitioner's claims are either without merit or procedurally defaulted Accordingly, I recommend that the petition be denied.

## Procedural History

### A.    Trial Court Proceedings

The state prosecution arose from the forgery of a substantial check owned by an elderly and disabled person, who had entrusted Petitioner to complete the check for a small sum to pay for gasoline.  Petitioner was charged with one count of forgery, and following a preliminary examination on October 2, 1997, he was bound over on the charge.  A supplemental information was filed charging Petitioner as a habitual offender, fourth offense, and he was arraigned on that charge immediately following the preliminary examination on October 2, 1997.  Petitioner was tried before a jury beginning February 9, 1999, and concluding on February 10, 1999.

The first witness to testify at trial was Robert Van Polen, the 86-year-old victim of the forgery.  (Tr. I, 127-28.)  Van Polen testified that he lives most of the year in Grand Rapids.  He comes to Highland Township in Osceola County during the summer months, and he stays in a mobile home he rents on his nephew's farm.  (Tr. I, 128-29.)  During those months, Van Polen tends bees and extracts honey.  (Tr. I, 128.)  In about 1950, Van Polen began doing business with a Sunoco gas station located a mile from his mobile home.  (Tr. I, 130.)  He had been familiar with prior proprietors and had continued to do business with Petitioner, the proprietor at the time of the incident in question.  (Tr. I, 131.)  Van Polen testified that he owned a 1979 Ford F-150 four-wheel-drive pickup with an automatic transmission, which he had purchased new.  (Tr. I, 132, 158-60.)  On Friday, October 9, 1996, Van Polen stopped by the gas station sometime between 4:00 p.m. and 6:00 p.m., after he finished his work with the bees. Petitioner was present, along with his children.  When Van Polen pulled into the gas station, he noticed for the first time a sign saying, "No checks."  (Tr. I, 138.)  Van Polen routinely had written checks to pay for his gasoline.  He mentioned the sign and

- 4 -

told Petitioner that he did not need to worry about the check because he had just gotten his bank statement and there was $1,200.00 in the account. (Tr. I, 138.)  As he filled Van Polen's gas tank, Petitioner began telling Van Polen that his wife had left him and she had previously paid him $225 each month for child support until some recent problems.  (Tr. I, 133.)  Van Polen commended Petitioner on the care and time he was taking with his children.  (Tr. I, 137.)  After Petitioner filled the tank, Van Polen signed a blank check to pay for the gas and gave it to Petitioner to complete the remaining parts of the check, as he had done on at least 50 prior occasions in the seven years since a stroke had limited the function of his right arm.  (Tr. I, 134-35, 141, 153.)  Instead of writing the amount of the check for $25.40, as he was authorized to do to pay for the cost of the gasoline, Petitioner wrote the check for $1225.40.  (Tr. I, 136, )  Van Polen denied owing Petitioner any money.  He stated that he had Petitioner do a variety of maintenance work on his truck over the years, such as performing grease jobs and oil changes, as well as replacing spark plugs and a muffler. Van Polen testified that he had always paid for work at the time of service and had not placed anything on credit for the last 30 or 40 years.  (Tr. I, 139-40.)

The Monday after the transaction, Van Polen returned to Grand Rapids for the season. (Tr. I, 140.)  When he returned to Grand Rapids, he discovered that his bank account was overdrawn, though the bank had advanced funds to cover the insufficient balance.  (Tr. I, 141.)  He went to the bank and discovered that Petitioner had written the check for $1,200 more than the authorized amount.  (Tr. I, 143.)  Van Polen did not want to offend Petitioner, so he called and asked Petitioner to look up the check again because he thought Petitioner had completed the check wrong.  (Tr. I, 144.) Petitioner promised to check, but he never returned Van Polen's call.  (Tr. I, 145.)  Petitioner also told Van Polen that he owed Petitioner money to replace his transmission, which he had never

paid.  Van Polen testified that he never owed people money, but always paid at the time of service.

(Tr. I, 145.)  Van Polen testified that he never gave Petitioner the authority to write the check for

$1,225.40; the amount Petitioner was authorized to enter was the price of the gasoline, $25.40.

(Tr. I, 146.)  In January 1997, a state police detective came to Van Polen's home to check the

numbers on his transmission.  (Tr. I, 146.)  The detective crawled under the vehicle to obtain

identification numbers.  (Tr. I, 146.)  Van Polen was shown a purported repair invoice from

Petitioner's gas station that bore the name "George Van Polen," marked as People's Exhibit 3.  Van

Polen denied having seen the invoice before and denied having any work done on any clutch disk

or bearing.  He stated that he had never been called "George" by anyone, and that Petitioner had

always called him by his last name.  He testified that he had never had major repairs completed and

never signed a repair authorization for a transmission repair.  (Tr. I, 147-48.)  He also testified that

he had never asked Petitioner to sign his signature to anything.  (Tr. I, 148.)  Petitioner never called

or approached Petitioner about paying him $1,200 during the seven or eight time he had seen him

since the date of the purported repair on August 3, 1995.  (Tr. I, 149.)  On cross-examination, Van

Polen acknowledged that he had been allowing Petitioner to complete his checks for some time but

had never before experienced a problem.  (Tr. I, 151, 155.)

    Michigan State Police Trooper David Winter testified that on January 7, 1997, he first

contacted Petitioner at his gas station while investigating a complaint about an altered check.  (Tr. I,

165.)  He showed Petitioner a copy of the Van Polen's check, which had been sent to him from the

Rockford Post of the State Police.  (Tr. I, 166.)  Winter asked Petitioner if he recalled having seen

the check before, and Petitioner advised that he had received it from Van Polen on the date indicated

on the check.  (Tr. I, 166.) Petitioner told Winter that Van Polen was fully aware of both the amount

of the check and the reason for the charges, which included work he had completed for Van Polen

on the transmission of the truck. (Tr. I, 167.) Petitioner reported that Van Polen was not happy about

giving him the check, but, because it had been owing for more than a year, he paid it.  According to

Petitioner, Van Polen asked him to hold the check, and Petitioner told Van Polen he was going to

deposit it to his business account, where it would take several days to clear. (Tr. I, 168.) Petitioner

reported that he had received a call from Van Polen about ten days later questioning him about the

check because his bank statement had shown him overdrawn. (Tr. I, 168.) Petitioner stated that,

although he thought Van Polen initially intended to get gas on October 9, 1996, Van Polen did not

do so after being confronted about the repair cost. (Tr. I, 168.) Winter asked for a copy of the repair

invoice. Petitioner told Winter he would get him one, but he did not have the records at the store.

(Tr. I, 169.) Four days later, Petitioner gave Winter a written statement and promised to give him

a copy of the work invoice. Winter identified People's Exhibit 4, as a photocopy of the work invoice

Petitioner eventually supplied.  Winter reported that he has never received an original. (Tr. I, 169-

70.) Petitioner told Winter that he had put a used transmission into Van Polen's truck, which he had

purchased from Ken's Auto Parts in Cadillac. (Tr. I, 170, 173.)  Winter contacted Ken Sharp, the

owner of the business, who told him that he could not check records because they had been destroyed

in a fire in May 1996. (Tr. I, 173.) On February 22, 1997, Winter conducted a search of Petitioner's

business, looking for work invoices from July, August and September 1995, and he found only six

such invoices. (Tr. I, 174-75.) The sequence of numbers from the 1995 work orders of that period

did not match the number on the purported work order concerning the Van Polen transmission. (Tr.

I, 175-78.) The work invoices from the relevant period spanned numbers 1276-1285, whereas the

number printed on the Van Polen work order was 0243. (Tr. I, 178.)

Michigan State Police Detective Sergeant Douglas McCallister testified that he had been assigned to the Auto Theft Unit of the state police since 1987. (Tr. I, 196-97.)  McCallister testified that all motor vehicles have a vehicle identification number (VIN) that can be used to identify where and when the vehicle was manufactured and can be linked to ownership of the vehicle. (Tr. I, 197-98.)  Besides being located in the front driver windshield area, a portion of the VIN concerning the production number, factory and year of the vehicle is used on a number of the vehicle's parts, including the engine, transmission and unibody or frame.  (Tr. I, 199.)  On February 13, 1997, McCallister went to Van Polen's residence and inspected his transmission to see if he could identify whether the VIN on the transmission matched the original vehicle. (Tr. I, 200.) He took photographs of the 1979 red Ford F-150 pickup truck he examined at Van Polen's address, which show a vehicle with an automatic transmission selector lever. (Tr. I, 202-03.)  He examined the transmission and found an automatic transmission.  He located consistent VIN numbers on the dash and driver's door, and he found on the transmission housing the last eight digits of the same VIN indicating the model year, factory and production number. (Tr. I, 205-06, 208.)  He took three ink lifts of the number, which he identified in court. (Tr. I, 206.)  A certified copy of the vehicle registration history showed Van Polen and his deceased wife as the original owners of the vehicle bearing the VIN number in question. (Tr. I, 209.)

The trial court took judicial notice that the Michigan sales tax was six percent after May 1, 1994. (Tr. II, 6.)  The prosecution then rested. (Tr. II, 8.)

Petitioner testified that he had serviced Van Polen's 1979 pickup on a number of occasions since he first opened his station in 1991.  He testified that he always knew Van Polen by the name of "George."  Over time, he has put on mufflers, repaired brakes and replaced tires.  In

- 8 -

addition, in 1991, he performed some work on the gear box of the transmission to correct problems with the four-wheel drive. (Tr. II, 14.) Petitioner testified that, in the summer of 1995, Van Polen came into the station reporting problems with the transmission. Petitioner took the truck for a test drive and found a problem with the clutch and the gears were grinding. He wrote an estimate for Petitioner on August 3, 1995. (Tr. II, 15.) According to Petitioner, he began work on the truck two days later. Petitioner called Ken's Auto Parts to get a used transmission and he sent one of his employees to pick it up. When the employee returned, Petitioner discovered that the housing was cracked on the replacement transmission. Petitioner called Roger at Ken's and was told they did not have another transmission. Petitioner then called Jeff Plomb at Bonney Motor Sales, who actually does transmission rebuilding for Petitioner. Plomb came to look at the transmission and reported that he could change the inside mechanisms and put them in the old housing. (Tr. II, 17.) Plomb completed the repairs and returned the transmission to Petitioner two days later. Petitioner put the refurbished transmission into the vehicle and it worked properly. (Tr. II, 17.) Van Polen came to pick up the vehicle after about ten days. Petitioner told him to drive it and see if it had any problems. He made further adjustments a few days later. Petitioner testified that he did not ask for payment at the time of service because he had known Van Polen for years and had assumed he would have no trouble getting the money. (Tr. II, 17.) Van Polen returned to Grand Rapids in September and Petitioner did not see him until the following spring. He asked Van Polen to pay him a couple of times, but Van Polen made excuses that he did not have a check. When Petitioner knew Van Polen would be returning to Grand Rapids in October 1996, he confronted Van Polen about making the payment. Van Polen could not find his invoice, so Petitioner went into the office to get his copy. Van Polen pulled up to the pump, as if to get gas, but he never did so. (Tr. II, 18.) Petitioner

- 9 -

disputed that Van Polen had gotten gas in the amount of $25.40, and he testified that he usually rounded gas prices off to the nearest dollar, so an amount of $25.40 was not typical.  (Tr. II, 19.) Van Polen told Petitioner that he was pretty sure he had enough money in the account to cover the check, but he asked Petitioner to hold the check until he got back on Monday so that he could make sure he had sufficient funds.  (Tr. II, 20.) Petitioner told him he intended to deposit it because it took about five days to clear a check, which would give Van Polen sufficient time to deal with the problem.  (Tr. II, 20.)

Petitioner testified that he and Van Polen had gotten into a discussion about child support payments, because Petitioner's children were present the day of the transaction.  Petitioner testified that he told Van Polen that he was receiving $225 in child support from his ex-wife; he was not paying child support. (Tr. II, 20-21.)  Petitioner testified that Van Polen called him the following week to ask if the check had cleared through his bank. Petitioner told him that he assumed so, but he would check.  Van Polen told Petitioner that he would call him back.  (Tr. II, 21.) Petitioner did not know whether the check caused Van Polen to have an overdraft.  He also did not dispute that the VIN on the transmission was the same as the vehicle because the original housing had been used. (Tr. II, 22.) Petitioner testified that the invoice number for the transaction did not match the sequential order of nearly contemporaneous repair transactions.  (Tr. II, 22.)  He explained that he had purchased the invoices in a quantity of 5,000 because he got a good deal on them. (Tr. II, 22.) He had five cases.  One case was at a desk in the back office and one was at a desk in the front office.  The summer had been busy, with a substantial amount of transient traffic.  (Tr. II, 23.)  He wrote up a significant number of estimates.  If the customer did not actually have the work done within a week or ten days, it was Petitioner's practice to dispose of the invoice as superfluous. (Tr. II, 24.)

Petitioner testified that when Trooper Winter first came to him in January 1997, he explained what had happened.  He told Winter that he was busy and could not take the time right then to look for the invoice or to write a statement.  He promised to make a copy and to write a statement and give it to Winter.  He did so and gave it to Winter when Winter returned.  (Tr. II, 25-26.)  The amount on the invoice included sales tax calculated on the cost of the parts at four percent because he believed that was the amount of sales tax at the time.  (Tr. II, 26.)  He had recalculated the amount recently at four percent, coming to a total of $24.48.  (Tr. II, 27.)  He testified that the invoice referred to a 1979 Ford F-250 pickup, standard transmission, four-wheel drive, with a creeper gear.  This was the transmission he worked on.  He did not know if Van Polen had other trucks.  (Tr. II, 27, 35.)

On cross-examination, Petitioner identified another check he had completed for Van Polen, in the amount of $21.75, showing that on at least that occasion, he had not rounded up to the nearest dollar.  (Tr. II, 29.)  The prosecutor also showed Petitioner multiple receipts from July and August 1995 on which he showed tax Petitioner had calculated at six percent, not four percent. (Tr. II. 29-31.) Petitioner denied having "dummied up" the receipt.  He testified that the original receipt was in his records, but that he had never been asked for it.  (Tr. II, 31.)  He further testified that he did not have a receipt from Bonney Motors for removing the casing from one transmission and replacing the others, though he stated he had paid $175 for the repair.  (Tr. II, 32.)  He testified that Bonney Motor Sales would not have a receipt because Plomb was a friend of Petitioner's who had done the work as a side job.  (Tr. II, 52.)  He did not include odometer readings, license plate numbers, or serial numbers on the invoice.  While the Secretary of State required a standard form, it was not strictly necessary to complete everything.  (Tr. II, 35.)  He charged Van Polen $450 for the transmission, but he only paid $275. Petitioner had no receipt for the purchase of the

transmission.  (Tr. II, 37.)  He stated that he had the cracked transmission rebuilt and did not go to another auto supply outlet when he could not get what he wanted from Ken's Auto Parts, both because he had called around and none were available and because he always did business with Ken's.  (Tr. II, 38.) Petitioner was shown a picture of the interior of Van Polen's truck, which he acknowledged was an automatic with a four-wheel drive shifter on the floor.  (Tr. II, 40.)  He was non-responsive when the prosecutor asked him if it was Van Polen's truck.  He later stated that it must have been a different truck.  (Tr. II, 40.) Petitioner also acknowledged that an automatic transmission did not have a clutch pedal, throw-out bearing or pressure plate.  (Tr. II, 45-46.)  He testified that the transmission he repaired had a clutch pedal that did not work properly and kept popping out of gear.  The clutch facing was scored, as was the pressure plate.  He testified that he did not itemize the pressure plate and throw-out bearing because they were standard replacements. (Tr. II, 46.)  He testified that Van Polen must have had two red 1979 Ford pickups, one an F-150 with an automatic transmission, and the other an F-250 with a standard transmission.  (Tr. II, 50.) Petitioner reported that he worked on the F-250.  (Tr. II, 50.)  He testified that he did not intend to defraud Van Polen or the bank.  In a non-responsive answer on redirect, Petitioner also testified that he gave Van Polen his money back.  (Tr. II, 57.) Petitioner testified that he no longer possessed the paperwork for any other repairs he had performed for Van Polen.  (Tr. II, 68.)  He stated that Van Polen had driven two different pickup trucks and an older four-door Oldsmobile car.  (Tr. II, 68.)

Joan Trudell testified for the defense that in the summer of 1995 she was having problems with the transmission of a car she purchased from Petitioner's brother.  She took it to Petitioner to check it out.  When she was there, a red Ford pickup truck was on the hoist. Petitioner told her to come back in a couple of days, when he expected the truck to be off the hoist.  When she went in a couple of days later, the truck was still on the hoist.  She went back a third time a couple

of days later.  The truck was still on the hoist, but they took it down and pushed it out so that Petitioner could fix her car.  (Tr. II, 71-72.)  She testified that she saw small parts all over the floor, including a transmission housing.  (Tr. II, 78, 85-87.)  On cross-examination, Trudell acknowledged that she was a good friend and babysitter for Petitioner and that she was testifying to help him.  (Tr. II, 76-77.)

John Cataldo, Petitioner's nephew, testified next for the defense that he had worked with his uncle at the shop off and on over the years Petitioner owned it, particularly during 1995 to 1997, when he had a vehicle with a motor that needed rebuilding.  During that time, he was at the shop approximately three times per week.  (Tr. II, 91.)  John Cataldo remembered Van Polen coming to the station on two occasions for gas, after which he would give a check to Petitioner to complete.  (Tr. II, 92-93.)  He remembered his uncle calling Van Polen by the name of "George."  (Tr. II, 92.)  He testified that he believed Van Polen drove a late 1970s or early 1980s Ford F-250 pickup.  (Tr. II, 96-97.)  The defense then rested.

On rebuttal, the prosecution recalled Trooper Winter.  Winter testified that, contrary to Petitioner's testimony, he had been out to Petitioner's place of business on only three occasions.  (Tr. II, 99.)

At the conclusion of trial and brief deliberations on February 10, 1999, the jury found Petitioner guilty of forgery.  (Tr. II, 140.)  On April 19, 1999, Petitioner was sentenced to serve a term of 15 to 40 years as a fourth habitual offender.  (Pet., App. 5, docket #1.) ]

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on November 8, 1999, raised three issues.[1]  (See Pet. at 2, docket #1.) Petitioner filed a supplemental *pro per* brief on appeal, raising seven additional issues.  He also attempted to raise an additional issue in rebuttal to the prosecutor's brief on appeal, though the claim was rejected by the court of appeals.  (See Pet. App. 63.)  By unpublished opinion issued on November 17, 2000, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (See 11/17/00 Mich. Ct. App. Opinion ("MCOA Op."), docket #58.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same ten claims raised before and rejected by the Michigan Court of Appeals.  By order entered June 26, 2001, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (See 6/26/01 Mich. Ord., docket #59.)

## C.    Post-conviction relief

On October 24, 2001, Petitioner filed a motion for relief from judgment in the Osceola County Circuit Court, raising eight claims allegedly based on newly discovered evidence. On November 19, 2001, Petitioner filed a supplemental motion for relief from judgment, raising an additional issue.  (See Pet. at 9, docket #1.)  In addition, on February 18, 2002, Petitioner sought to amend his motion for relief from judgment to add an additional, multi-pronged issue.  (See Pet. at 10, docket #1.)  In a lengthy opinion dated May 3, 2002, the trial court denied the motion.  (See

---

[1]Petitioner's history of raising claims is complex and duplicative.  As a consequence, the Court will not identify each of the claims raised at each stage of the litigation at this time.  Instead, when addressing the substance of each of Petitioner's habeas claims, the Court will specifically identify when such claims were raised in the state courts.

5/3/02 Tr. Ct. Op., docket #56.)  Petitioner filed an application for leave to appeal to the Michigan Court of Appeals, raising the same ten claims.  On April 1, 2003, the court of appeals denied leave to appeal on the grounds that Petitioner had failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).  (See 4/1/03 MCOA Ord., docket #56.) Petitioner sought leave to appeal to the Michigan Supreme Court, raising nine of the ten claims raised in the court of appeals, plus a tenth claim previously raised on direct appeal.  The supreme court denied leave to appeal on July 28, 2003, on the grounds that Petitioner had failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).  (See 7/28/03 Mich. Ord, docket # 57.)

In the interim, on April 30, 2003, Petitioner filed a state petition for writ of habeas corpus in the Muskegon County Circuit Court, raising a single claim previously raised both on direct appeal and again in the motion for relief from judgment.  (See Pet. at 17, docket #1.)  The circuit court dismissed the action with prejudice on May 23, 2003.  (See Pet. App. 64, docket #1.) Petitioner filed an independent habeas corpus petition in the Michigan Court of Appeals on June 3, 2003, raising the same claim.  The Court of Appeals entered an order of denial on July 2, 2003.  (See Pet. App. 65, docket #1.) Petitioner's federal habeas petition was filed on or about August 7, 2003.

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 ("AEDPA"). *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir.), *cert. denied*, 124 S. Ct. 535 (2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

**Discussion**

I.    Denial of Counsel During Critical Stage of Proceedings

Petitioner's first ground for habeas relief was first raised in his *pro per* supplemental brief on direct appeal, and in his application for leave to appeal to the Michigan Supreme Court. The argument was renewed in his application for leave to the Michigan Supreme Court on review of his motion for relief from judgment. Petitioner also raised the issue in his state-court petitions for habeas corpus.

Petitioner contends that he was denied counsel for a period of ten months during the lengthy period before trial. When Petitioner was first charged, the district court appointed an attorney at public expense, who represented Petitioner at a preliminary hearing held October 2, 1997. Subsequently, on October 27, 1997, the circuit court determined that Petitioner was not indigent and could afford to hire his own attorney, and it revoked appointed counsel. Petitioner did not retain counsel thereafter. On November 3, 1997, December 29, 1997, February 9, 1998, February 23, 1998, March 30, 1998 and April 20, 1998, the trial court adjourned pre-trial hearings. A final pre-trial hearing was held on May 4, 1998, at which Petitioner was not represented by counsel. At this hearing, some discussion concerning the prospects for settlement occurred, and the parties discussed the anticipated length of trial. By August 10, 1998, the next hearing date, Petitioner again had been appointed an attorney. Various subsequent pre-trial hearings were held at which Petitioner was represented by appointed counsel. Trial began on February 9, 1999, six months after counsel was appointed.

In *Strickland v. Washington*, 466 U.S. 668, 687-88  (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's

performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. The Court has recognized, however, that the denial of counsel during a critical stage of the proceeding amounts to a *per se* denial of the effective assistance of counsel. *See United States v. Cronic*, 466 U.S. 648 (1984). The court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Id.* at 659 n.25. "In other words, when counsel is totally absent during a critical stage of the proceedings, prejudice must be presumed." *Mitchell v. Mason*, 325 F.3d 732, 741 (6th Cir. 2003), *cert. denied*, 125 S. Ct. 861 (2005).

In *Bell v. Cone*, 535 U.S. 685 (2002), the Supreme Court defined the differences between ineffective assistance of counsel claims governed by *Strickland* and claims governed by *Cronic*. If a claim is governed by *Strickland*, a defendant typically must demonstrate that specific errors made by trial counsel affected the ability of the defendant to receive a fair trial. If a claim is governed by *Cronic*, however, the defendant need not demonstrate any prejudice resulting from the lack of effective counsel. *Mitchell*, 325 F.3d at 741 (citing *Bell*, 535 U.S. at 695). Three types of cases warrant the presumption of prejudice: (1) when the accused is denied the presence of counsel at a critical stage; (2) when counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) when counsel is placed in circumstances in which competent counsel very likely could not render assistance. *Id.* (quoting *Bell*, 535 U.S. at 695).

As the *Bell* Court noted, a constitutional violation is per se prejudicial only if the error occurs during a "critical stage" of the prosecutorial process. *Bell*, 535 U.S. at 95-96. What constitutes a critical stage requiring counsel depends upon "whether potential substantial prejudice

to defendant's rights inheres in the . . . confrontation and the ability of counsel to help avoid that prejudice." *United States v. Wade*, 388 U.S. 218, 227 (1967).

The Michigan Court of Appeals addressed the claim as follows:

> Defendant next asserts he was denied counsel at critical stages of the proceedings. The record shows, however, not that he was denied counsel, but that the court's appointment of counsel was temporarily revoked when the trial court determined defendant to be ineligible for appointed counsel. The court again appointed counsel before plea negotiations reached a critical stage, and long before trial. There is nothing in the record to indicate the trial court was mistaken in its finding of fact as to defendant's financial ineligibility for appointed counsel, nor is there anything in the record to indicated defendant lacked counsel at any critical stage of the proceedings.

(11/17/00 MCOA Op. at 3.)

The determination of the court of appeals constitutes a reasonable application of clearly established Supreme Court precedent in the circumstances of this case. In *Mitchell*, 325 F.3d 732, the Sixth Circuit concluded that in certain circumstances, the denial of pretrial representation could rise to the level of a complete denial of counsel at a critical stage, subject to review under the *Cronic* standard. The court granted habeas corpus relief to a Michigan prisoner whose counsel was suspended from practice for the entire month immediately preceding trial, had never interviewed the petitioner before trial, had failed to respond to the petitioner's letters, had failed to respond to the petitioner's mothers letters, and had failed to speak with or call witnesses to the events underlying the charge of first-degree murder. The *Mitchell* court concluded that the combination of circumstances resulted in a complete denial of counsel during the critical pretrial investigation phase. *Mitchell*, 325 F.3d at 742.

In the instant case, in contrast, although Petitioner asserts he was denied counsel at a critical stage, Petitioner was not denied counsel; he was at some point found ineligible for court-appointed counsel. While he now argues that he did not have the funds to hire a particular attorney,

he does not assert that he could find no attorney to represent him or that he renewed his request to have counsel appointed after finding that he could not pay an attorney.  Indeed, it is apparent from the record of the May 4, 1999 status hearing that the prosecutor was concerned about a change in Petitioner's financial circumstances, and the trial court advised Petitioner that he could reapply for counsel if his financial circumstances had changed:

> MR. TALASKE: Your Honor, if the matter does ultimately proceed to trial, and Mr. Cataldo is having difficulty raising enough money to pay his restitution, he may in fact qualify for court-appointed counsel, although that appointment was revoked previously by the Court.  I understand that Mr. Cataldo has experienced a rather dramatic change of his financial circumstances, so that may be something we're going to have to look at down the line.

> THE COURT: What the prosecutor is suggesting is that if the case doesn't settle because of your mortgage effort here in the next couple of weeks, he's basically inviting you to submit a petition for appointed counsel, give me updated information regarding your financial condition.  And he believes that my decision may change and you may again qualify for court-appointed counsel.  I don't know what the change is.

> If the case settles, it's moot.  If the cases don't settle and the case proceeds, if you do want to ask for court-appointed counsel, I'll look at it again, but you'll have to fill out the form under oath, and we'll take a look at it when that comes in.

(Mem. in Support of Pet., App. 3, at 5-6.)  Despite this, the circuit court docket does not reflect that Petitioner renewed his request at any time before counsel was again appointed on August 10, 1998. (Mem. in Support of Pet., App. 5.)

In addition, unlike in *Mitchell*, trial counsel represented Petitioner for six months prior to his trial and had the opportunity to prepare for trial.  The period of time during which Petitioner was deemed not to be indigent but chose not to hire his own attorney does not constitute

a complete denial of counsel during a critical stage of the proceedings.[2]  As a consequence, Petitioner is not entitled to the presumption of prejudice under *Cronic*.

Instead, Petitioner's claim must be analyzed under the standard of *Strickland*.  "When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'"  *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697).  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Strickland*, 466 U.S. at 697.

Petitioner cannot show prejudice caused by the lack of counsel during the pretrial period.  Trial counsel began representing Petitioner six months before trial and engaged in numerous settlement discussions. Petitioner did not waive any rights during his unrepresented period and nothing that occurred during the period had any influence on the outcome of trial. Petitioner therefore fails to demonstrate that the ineffective assistance of counsel caused prejudice during the time he was denied court-appointed counsel.

I therefore recommend that Petitioner's first ground for relief be denied.

---

[2]To accept Petitioner's argument, a non-indigent defendant could refuse to hire counsel for any portion of the pretrial period and then claim at a later date that he was "deprived" of counsel during a critical stage.  Such a result is untenable.

II.    Res Gestae Witness

In his second ground for relief, Petitioner contends that the prosecutor intimidated defense witness Eugene Keiling by threatening to prosecute him for welfare fraud if he testified. Petitioner raised his second ground for habeas relief in two arguments in his supplemental brief on direct appeal to the Michigan Court of Appeals and in one argument in his application for leave to appeal to the Michigan Supreme Court.  He again raised it as his second claim in his motion for relief from judgment, and he sought to appeal the claim to both the Michigan Court of Appeals and the Michigan Supreme Court.

Petitioner asserts that Keiling would have testified for the defense that he assisted in the transmission repairs to Van Polen's truck.  He argued that, before the second day of trial convened, defense counsel apprized Petitioner that the prosecutor had told her if witness Keiling testified, he would have him thrown in jail before he left the courthouse and would prosecute him for welfare fraud. Petitioner asserts that he asked defense counsel to bring the matter to the attention of the court, but counsel refused, asserting that the prosecutor was within his rights.  The Michigan Court of Appeals found the claim not to have been properly presented to the court:

> Defendant also alleges additional instances of prosecutorial misconduct, claiming the prosecutor intimidated a key witness.  The record, however, is devoid of any evidence supporting this claim.  This Court cannot consider a claim of error based on alleged facts outside the record.  *Wiand v Wiand*, 178 Mich App 137; 443 NW2d 464 (1989).

(11/17/00 MCOA Op. at 3.)  Subsequently, in the trial court's decision on Petitioner's motion for relief from judgment, the court undertook a review of the facts of the alleged intimidation.  The court relied on a hearing held on December 3, 1999, on a motion to disqualify the trial judge in two other

- 23 -

criminal cases, Nos. 97-2749 and 97-2750.  The court recited the following questions and responses

directed by the prosecutor to Petitioner's trial counsel:

Q.     Did you have some discussion with me with regard to Mr. Kailing [sic]?

A.     I let you know that Mr. Kailing was going to – was there to testify.

Q.     Did you tell me just generally what he was going to say?

A.     I indicated to you that he was going to testify that he had worked for Paul during the time period that this event allegedly occurred and that he was the one that had drove the transmission back and forth from the repair place to Paul's station.

Q.     Did I ask you anything about his proposed testimony?

A.     You asked me if he – if he had a criminal background, if he was on probation, and if he was actually employed by Mr. Cataldo.

Q.     Do you recall any other conversation between you and I?

A.     You just indicated to me that you thought that there had been a paternity done and that Mr. – Mr. Kailing was on assistance.

Q.     On welfare?

. . .

A.     Yes, that Mr. Kailing was on – supposed to be on welfare. . . . He asked me – he told me that he thought that there had been a paternity done and Mr. Kailing had indicated that he was getting assistance or welfare.

. . .

Q.     Did I, at any time, threaten to have Mr. Kailing arrested for welfare fraud?

A.     No.  You cautioned me regarding whether or not he testified that he was on assistance and being paid, that you would ask him those questions.

Q.     Did I also indicate to you that depending on why he was on felony probation, I may impeach his credibility?

A.     Yes, you did.

- 24 -

(5/3/02 Cir. Ct. Op. at 5; docket #56.)  Defense counsel also testified that she spoke to Keiling alone,

and he indicated to her that he was on assistance.

> Q.      Did you have any other conversation?
>
> A.      I – I asked him whether or not he was being paid by Paul at the time.  He
> indicated that he was, that he [sic] being paid cash.  I then cautioned him in regards
> to the fact that you – he may be asked those questions and it could set him up for
> some kind of a welfare fraud claim.
>
> Q.      Did you tell him I threatened to have him arrested for welfare fraud?
>
> A.      No.
>
> Q.      Did you –
>
> A.      I cautioned him regarding it.
>
> Q.      Did you tell him I threatened to have him arrested then and there if he
> testified?
>
> A.      No.
>
> Q.      Did you tell him that I threatened to have him arrested then and there if he
> testified?
>
> A.      No.  No.
>
> Q.      Is that even a possibility, as far as you know?
>
> A.      No.  And the only thing that I did was cautioned him and told him that he had
> to be careful regarding what he testified to?
>
> Q.      Did you feel that it was your professional obligation?
>
> A.      I did.  I didn't think that I could set – set him up to be impeached on – or first
> be impeached on the stand, and then set him up for a criminal charge, knowing that
> I – that you knew about his background.

(5/3/02 Cir. Ct. Op. at 6; docket #56.)  According to the trial court, Booher thereafter testified that

she had spoken again to her client, who made the decision that the witness would not testify.  Booher

stated that Petitioner had suggested that Keiling could testify that he was not being paid, and Booher became concerned about offering "perjured testimony on the stand." She testified that Petitioner did not suggest that Keiling had been threatened until sometime after the trial was over. (5/3/02 Cir. Ct. Op.; Pet. App. 18, at 6.) Based on Booher's testimony, the trial court concluded that the prosecutor had not spoken with Keiling and that no threats had been made.

The court further concluded that Petitioner had failed to meet the requirements of establishing entitlement to relief under MICH. CT. R. 6.508(D), notwithstanding the fact that the claim could have been and was raised on direct appeal. First, the court held that Petitioner could not demonstrate good cause for his delay in presenting the details of the claim, including the affidavit by Mr. Keiling. Petitioner relied on the affidavit Keiling completed nearly a year after the alleged intimidation occurred, which was apparently signed ten months before the court of appeals decision on direct appeal. Second, the court found he had failed to demonstrate actual prejudice in light of the other evidence in the case. Both the Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal on the grounds that Petitioner had failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D).

Petitioner's factual claim, based on evidence not raised on direct appeal, most likely is procedurally defaulted.[3] However, where the procedural default issue raises more questions than

---

[3]When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim "will

the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.  *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

        Petitioner's second ground for habeas relief clearly is without merit.  The trial court made specific factual findings concerning the circumstances of the alleged threat to the defense witness.  The court expressly concluded that no threat had been made.  The court's findings are entitled to a presumption of correctness, and Petitioner has not met his burden of rebutting the presumption by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1);  *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.  Accordingly, I recommend that Petitioner's second ground for habeas relief be denied.

        III.     <u>Denial of Sixth and Fourteenth Amendment Rights</u>

        Petitioner's third ground for habeas relief comprises multiple, unrelated claims. First, Petitioner argues that the prosecutor improperly used false testimony by witness McCallister regarding the meaning of the digits in the vehicle VIN number.  Second, he contends that the prosecutor engaged in misconduct by arguing facts not in evidence and misrepresenting the evidence. Petitioner raised this second portion of the claim on direct appeal to the Michigan Court of Appeals

---

result in a fundamental miscarriage of justice."  *Hicks*, 377 F.3d at 551-52; *see Murray v. Carrier*, 477 U.S. 478, 495 (1986)) (specifying that a 'fundamental miscarriage of justice' will result "where a constitutional violation has probably resulted in the conviction of one who was actually innocent.").

        Here, the trial court, the Michigan Court of Appeals and the Michigan Supreme Court expressly stated that they denied Petitioner's application for leave to appeal on the basis that Petitioner failed to "meet the burden of establishing entitlement to relief under MCR 6.508(D)."  (4/1/03 M COA Ord., docket #56; 7/28/03 Mich. Ord., docket #57.) Because MICH. CT. R. 6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place some time thereafter, MICH. CT. R. 6.508(D) was a "firmly established" procedural rule for purposes of Petitioner's action.  *See Luberda v. Trippett*, 211 F.3d 1004, 1007 (6th Cir. 2000); *Rogers v. Howes*, 144 F.3d 990, 994 (6th Cir. 1998). As a result, the claim is procedurally defaulted.  Absent a showing of cause and prejudice or a miscarriage of justice, Petitioner is not entitled to habeas corpus review of his claim.

and Michigan Supreme Court. Third, he asserts he was deprived of his right to the effective assistance of counsel when his attorney failed to secure the attendance of four defense witnesses: Sharp, Plomb, McKulley and Keiling. This claim again was raised on direct appeal in both appellate courts. Fourth and fifth, Petitioner argues that his attorney was ineffective when she failed to obtain an independent expert witness and failed to offer an exhibit to rebut the prosecution's contention that Petitioner altered his story. Finally, Petitioner claims that the trial court had a duty to appoint an independent expert for Petitioner. All of these consolidated claims were raised in a single ground in Petitioner's motion for relief from judgment, which he sought leave to appeal to the court of appeals and supreme court.

### A. Claims raised in appeal of right

#### 1. Ineffective assistance of counsel

As part of his claim, Petitioner argues that he received ineffective assistance of trial counsel when his attorney failed to secure the attendance of four defense witnesses. This portion of Petitioner's claim was raised on direct appeal.

As I previously have noted, to establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *See Strickland*, 466 U.S. at 687-88. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v.*

- 28 -

*United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

The Michigan Court of Appeals addressed the issue as follows:

> Defendant, in his brief in propria persona, raises other areas where he believes his trial counsel was ineffective, claiming she failed to subpoena endorsed witnesses or object to prosecutorial intimidation of a potential witness. For two reasons, these objections must fail. First, defendant points to nothing in the record substantiating the incidents he claims occurred, relying instead on unsubstantiated statements in his brief. Where no motion for a new trial is made or evidentiary hearing conducted in the trial court on an ineffective assistance of counsel claim, this Court is limited to a review of the existing record. *People v Johnson*, 144 Mich App 125, 129-130; 373 NW2d 263 (1985). Moreover, at least as far as the failure to subpoena witnesses is concerned, the record makes clear that any deficiency resulted from defendant's failure to cooperate with his attorney, not from his attorney's inaction.

(11/17/00 MCOA Op. at 2-3.)

The determination by the court of appeals clearly was reasonable. On the first day of trial, counsel moved to withdraw, citing a breakdown in the communications between counsel and Petitioner. She represented to the court that she had sent numerous letters to Petitioner asking him to contact her, and that she had attempted to contact him by telephone. Petitioner repeatedly failed to make the necessary contact, appearing to demonstrate an "extreme disregard" for her and for the case. (Tr. I, 3-4.) Petitioner did not dispute that he had failed to communicate with counsel, though

he vaguely argued that he had transportation problems.  He expressly represented to the court that he wished to have counsel continue to represent him.  (Tr. I, 5-6.)  In response, the prosecutor represented that the victim of the case was 86 years old and was present and ready to proceed with trial.  He also noted that only three weeks remained before expiration of the 18-month speedy trial limit. (Tr. I, 5.)  Upon consideration of all the facts, the court declined to allow counsel to withdraw, given that the problems she had experienced undoubtedly would have been experienced by any other attorney.  (Tr. I, 10.)  The court found that Petitioner had placed his attorney in an untenable position by his lack of cooperation.  (Tr. I, 10-11.)  Counsel then requested an adjournment, stating that, as the result of Petitioner's lack of cooperation, she did not feel prepared to proceed at trial that day.  She had been unable to discuss the jury array with her client, had not been able to prepare an opening statement and had not had the opportunity to speak to witnesses.  (Tr. I, 11.)  Counsel asserted that she had been unable to contact all of the endorsed witnesses because Petitioner repeatedly failed to provide her the addresses.  Although she had located some of the witness addresses herself, she was unable to locate others.  (Tr. I, 6.)  She had sent subpoenas to those witnesses she could find.  (Tr. I, 15.)  The prosecutor opposed the motion in light of the many delays in the case, the age of the victim, and the difficulties assuring the victim's presence from Grand Rapids since he could no longer drive.  (Tr. I, 18.)  Considering the age and health of the victim, the prosecutor's right to a speedy trial, and the court's crowded docket, the court denied the request to adjourn.  (Tr. I, 19.)

As the trial court and the court of appeals found, it is apparent from the record that Petitioner's own obstructionist behavior caused counsel's difficulties in finding and producing witnesses.  By his own representations, Petitioner had not yet located the witnesses he planned to call at trial, and only belatedly was making an effort to do so.  (Tr. I, 17.)  The failure to ensure the

presence of witnesses, therefore, cannot be attributed to the counsel's performance. Petitioner has

failed to overcome the presumption that counsel performed appropriately.

> 2.      Prosecutorial misconduct

Petitioner also presented a portion of his claim of prosecutorial misconduct on direct

appeal.  The court of appeals addressed the question at length:

> Defendant also contends that the prosecutor committed misconduct by aggressively cross-examining him, first as to whether he had "dummied up" the transmission repair invoice and second as to why he had closed his service station. Defendant also alleges misconduct in the prosecutor's closing argument comment regarding the failure of the defense to present corroborating witnesses it had previously indicated would testify.

> We initially note that the defense objected only to the cross-examination concerning the reason the service station closed, thereby failing to preserve the other instances of alleged prosecutorial misconduct.  Reversal based on these unpreserved instances is accordingly warranted only if defendant is actually innocent or if error seriously affected the fairness, integrity or public reputation of judicial proceedings. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).  Because there was ample evidence from which the jury could have concluded that defendant is guilty, we cannot say that he is actually innocent.  Nor can we say that the prosecutor's conduct seriously affected the fairness, integrity or public reputation of the trial.  Indeed, we believe his conduct was not improper.  The aggressive questions about "dummying up" the invoice were not unfair, given the anomalies with the invoice that raised questions about its authenticity.  See *People v Noble*, 238 Mich App 647, 660; 660 NW2d 123 (1999).  Comments on the failure of a defendant who testifies on his own behalf to produce corroborating witnesses are permitted.  *People v Spivey*, 202 Mich App 719, 723; 509 NW2d 908 (1993).

> Where the issue of prosecutorial misconduct is preserved by timely objection, the standard is whether the misconduct deprived defendant of a fair and impartial trial.  *People v. Rice*, 235 Mich app 429, 434-435; 597 NW2d 843 (1999).  Viewed by this standard, there was no error when the trial judge allowed the prosecutor to cross-examine defendant as to whether he had sold his service station to raise funds to repay his brother his bond money.  Defendant himself had raised the subject by testifying that he had closed the service station due to police harassment in the form of a number of visits by officers investigating this case.  His credibility and the credibility of the prosecution's case were at issue, given that his testimony as to the number of visits to the station by officers was seriously at odds with the testimony

of prosecution witnesses. The prosecutor was entitled to try to resolve the credibility issue by exploring whether the testimony was truthful. We cannot say that this questioning denied defendant a fair trial.

(11/17/00 MCOA Op. at 2.)

The scope of review in a habeas corpus action of prosecutorial misconduct is narrow. A petitioner must do more than show erroneous conduct. "The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. De Christoforo*, 416 U.S. 637, 643 (1974)). The habeas court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). In addition, the court may view any misconduct in light of the strength of the competent proofs tending to establish guilt. *See Angel v. Overburg*, 682 F.2d 605, 608 (6th Cir. 1982) (*en banc*). "The touchstone of due-process analysis is the fairness of the trial, not the culpability of the prosecutor." *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).

In the instant case, Petitioner objected at trial to only one instance of alleged prosecutorial misconduct. Specifically, he objected to the prosecutor's inquiry regarding the reason for the sale of the service station. As the court of appeals noted, Petitioner opened the door to this question by suggesting that police harassment had caused him to close the station. In light of strong conflicting evidence that police did not harass Petitioner by repeatedly visiting his place of business, the prosecutor clearly was within his rights to challenge Petitioner's credibility about his reasons for closing. Regardless, however, the reference clearly did not rise to the level of a due process violation

- 32 -

or result in an unfair trial.  The determination by the Michigan Court of Appeals, therefore, constituted a reasonable application of clearly established Supreme Court precedent.  28 U.S.C. § 2254(d).

Petitioner's remaining complaints of prosecutorial misconduct are procedurally defaulted. The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying the bulk of Petitioner's prosecutorial misconduct claim.  It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial.  *See, e.g.*, *People v. Kelly*, 423 Mich. 261, 271 (1985).  A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy."  *Lee*, 534 U.S. at 385.  Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court.  *See Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).  Accordingly, review by this court would be barred unless Petitioner can show cause and prejudice.  *Coleman v. Mitchell*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 485 (1986).

Petitioner broadly argues that his trial counsel was ineffective for failing to object to what he asserts are clear violations of his right to a fair trial.  Petitioner asserts that the prosecutor called Petitioner a liar at least sixteen times (Tr. II 31, 33, 34, 36, 45, 57, 101, 102, 116, 118, 119, 120, 124, 125, 134); asserted personal knowledge of the testimony and evidence, misrepresented the evidence and injected misleading statements of fact at numerous places during trial (Tr. II, 43-44, 47-48, 49-50); engaged in egregious conduct (Tr. II, 34, 36, 49, 57, 58); injected into the proceedings erroneous information (Tr. II, 38, 39, 69); gave personal opinions (Tr. II 38, 39, 40, 41, 42); vouched

- 33 -

for the credibility of witnesses (Tr. 115, 116, 119, 126); made improper and prejudicial remarks (Tr. II 45, 123); gave false and misleading statements of fact (Tr. II 120, 122); accused Petitioner of income tax evasion (Tr. II 124); gave unsworn testimony (Tr. II 135); accused Petitioner of fabricating his story (Tr. II 120); shifted the burden of proof (Tr. II 116); played on the sympathy of the jury (Tr. II 123); improperly cross-examined witnesses (Tr. II 74-80); bolstered the credibility of witnesses (Tr. II 115-16); and argued his personal beliefs (Tr. II 126).

Petitioner's characterization of the prosecutor's conduct is wholly unsupported.  A review of Petitioner's references to improper conduct reveals that Petitioner fundamentally objects to the prosecutor's aggressive questioning during cross-examination, which demonstrated the inconsistencies in Petitioner's testimony.  To the extent the questioning and the resulting responses suggested that Petitioner was not truthful, that he was fabricating his story and that other witnesses had testified differently, the prosecutor was properly putting the evidence before the jury to make its own determination of credibility.

The Michigan Court of Appeals agreed, concluding that:

> Defendant next alleges ineffective assistance of counsel, because his attorney did not object to the alleged instances of prosecutorial misconduct (except for that regarding the service station sale) set out above.  Because the prosecutor's comments were not improper, it follows that defense counsel was not ineffective in failing to object to them.  Defense counsel was not ineffective in failing to object to them. Defense counsel is not required to raise a meritless objection.  *People v Torres (On Remand)*, 222 Mich App 411, 425; 564 NW2d 149 (1997).

(11/17/00 MCOA Op. at 2.)  Because no constitutionally cognizable misconduct occurred, defense counsel clearly was not ineffective for failing to introduce objections to it.  *See Chegwidden v. Kapture*, No. 03-1527, 2004 WL 551471, at *2 (6th Cir. March 18, 2004) (counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel), *cert. denied* 125

S. Ct. 172 (2004); *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); Koch v. Puckett, 907 F.2d 524, 527 (5th Cir.1990); *United States v. Wright*, 573 F.2d 681, 684 (1st Cir. 1978). Petitioner's procedural default of his claims, therefore, is not excused by the ineffective assistance of counsel.

### B.     Claims not raised on direct appeal

The remaining portions of Petitioner's omnibus third ground for relief also are procedurally defaulted because he failed to raise them in his appeal of right.  Instead, Petitioner raised the remaining portions of the claim for the first time in his motion for relief from judgment. According to Mich. Ct. R. 6.508(D), a motion for relief from judgment may only be granted in limited circumstances, the relevant portion of which provides:

> (D)  Entitlement to Relief.  The defendant has the burden of establishing entitlement to the relief requested.  The Court may not grant relief to the defendant if the motion
>
> . . .
>
> (2) alleges grounds for relief which were decided against the defendant in a prior appeal or proceeding under this sub-chapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision;
>
> (3)  alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this sub-chapter, unless the defendant demonstrates
>
> > (a)  good cause for failure to raise such grounds on appeal or in the prior motion, and
> >
> > (b)  actual prejudice from the alleged irregularities that support the claim for relief.  As used in this sub-rule, "actual prejudice" means that,

- 35 -

> > (i) in a conviction following a trial, but for the alleged error, the defendant would have had a reasonably likely chance of acquittal;
>
> >        . . .
>
> > (iii) in any case, the irregularity was so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case;
>
> The Court may waive the "good cause" requirement of sub-rule (D)(3)(a) if it concludes that there is a significant possibility that the defendant is innocent of the crime.

Mich. Ct. R. 6.508(D). The Michigan Court of Appeals and the Michigan Supreme Court both expressly stated that they denied Petitioner's application for leave to appeal on the basis that Petitioner failed to "meet the burden of establishing entitlement to relief under M.C.R. 6.508(D)." (4/1/03 MCOA Ord., docket #56; 7/28/03 Mich. Ord.; docket #57.) Under M.C.R. 6.508(D)(2) and (3), a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised on direct appeal. For claims that could have been raised, the defendant is entitled to relief only if he can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." M.C.R. 6.508(D)(3)(a)-(b). In assessing how "firmly" a state procedural rule has been established, the critical inquiry is whether, viewed from the time of the petitioner's later significant actions or inaction, the petitioner could be deemed to have been apprised of the procedural rule's existence. *Luberda*, 211 F.3d at 1006-1007. Because M.C.R. 6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place some time thereafter,

- 36 -

M.C.R. 6.508(D) was a "firmly established" procedural rule for purposes of Petitioner's action. *See Luberda*, 211 F.3d at 1007; *Rogers*, 144 F.3d at 994.

Further, the Sixth Circuit repeatedly has recognized that, in cases where the Michigan Court of Appeals and Michigan Supreme Court deny leave to appeal on the basis that a petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)," it is sufficiently clear that the supreme court intended to invoke a procedural bar. *See Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004); *Abela v. Martin*, 380 F.3d 915, 923 (6th Cir. 2004); *see also Hargrave-Thomas v. Yukins*, 374 F.3d 383, 388 (6th Cir. 2004); *Burroughs v. Makowski*, 282 F.3d 410 (6th Cir. 2002), *modified in other part*, No. 00-1471, 2002 WL 1115469 (6th Cir. May 16, 2002); *Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000). It therefore is clear that "the last state court to review [the prisoner's] conviction 'clearly and expressly' relied on [the prisoner's] procedural default in its decision affirming Petitioner's conviction." *Rust*, 17 F.3d at 161.

As cause excusing his procedural default, Petitioner raises the ineffective assistance of appellate counsel. To serve as cause to excuse the default, a claim of ineffective assistance of counsel must be properly exhausted. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001); *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001). Petitioner did not raise his claim of ineffective assistance of appellate counsel as a separate issue in his motion for relief from judgment and appeal it to all levels of appellate review. He did, however, argue that the ineffective assistance of appellate counsel served as cause permitting him to raise the claim on review under MICH. CT. R. 6.508(D).

Assuming Petitioner may be considered to have exhausted his claim of ineffective assistance of appellate counsel and further assuming that the claim of ineffectiveness is itself not

procedurally defaulted, *see Munson*, 384 F.3d at 316; *Deitz v. Money*, 391 F.3d 804, 810 (2004), Petitioner cannot demonstrate that appellate counsel was ineffective for failing to raise his disjointed third habeas ground.  In order to excuse a procedural default, Petitioner must show that his appellate counsel's failure to raise the ineffectiveness of trial counsel rose to the level of a constitutional violation under *Strickland*, 466 U.S. 668.  *See McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004).  An appellant has no constitutional right to have every non-frivolous issue raised on appeal.  "'[W]innowing out weaker arguments on appeal and focusing on 'those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).  To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions."  *Strickland*, 466 U.S. at 688.  As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another.  *Smith v. Robbins*, 528 U.S. 259, 289 (2002).  In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present."  *Id.* at 289.

Petitioner has not made the requisite showing.  Counsel raised the three strongest claims on direct appeal.  The arguments presented in Petitioner's third issue on habeas review, to the extent they do not overlap the prosecutorial misconduct claims raised by appellate counsel, are without significant support in either the record or the law. Petitioner therefore has failed to demonstrate cause excusing his procedural default.  Where a petitioner fails to show cause, the court

- 38 -

need not consider whether he has established prejudice. *See Smith v. Murray*, 477 U.S. 527, 533 (1986); *Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982).

In sum, the various components of Petitioner's third ground for habeas relief are either procedurally barred or without merit.

IV.   Erroneous Instructions

In his fourth ground for habeas relief, Petitioner asserts that he was denied due process by several instructional errors by the trial court: (1) refusing to instruct on lesser included offenses; (2) failing to give an instruction on the use of character evidence; and (3) unfair inclusion of prosecution theory but not defense theory in the instructions. All three portions of the fourth ground were raised for the first time in Petitioner's motion for relief from judgment and are procedurally defaulted because both the Michigan Court of Appeals and the Michigan Supreme Court denied review on the basis of MICH. CT. R. 6.508(D). *See, e.g., Munson*, 384 F.3d at 314; *Abela*, 380 F.3d at 923; *Hargrave-Thomas*, 374 F.3d at 388. When a petitioner has procedurally defaulted in the state courts, the federal habeas court will only entertain the defaulted issue if the petitioner can show "cause" for the procedural default and "actual prejudice" as result of the alleged federal violation or can show actual innocence. *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 485; *Rust*, 17 F.3d at 160-61.

Assuming Petitioner could demonstrate cause and actual prejudice excusing his default, his claim does not warrant habeas relief. A claim that a trial court gave an improper jury instruction is not cognizable on habeas review. The Sixth Circuit Court of Appeals, sitting *en banc*, has held that the failure to give an instruction on a lesser-included offense, even when requested by counsel, is not of the "character or magnitude which should be cognizable on collateral attack."

- 39 -

*Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (*en banc*). The *Bagby* Court held that failure to instruct on lesser-included offenses in a noncapital case is reviewable in a habeas corpus action only if the failure results in a miscarriage of justice or constitutes an omission inconsistent with the rudimentary demands of fair procedure. *Id.*; *accord Samu v. Elo*, No. 00-1184, 2001 WL 814929, at *1 (6th Cir. July 9, 2001); *Williams v. Hofbauer*, No. 00-1526, 2001 WL 133135, at *2 (6th Cir. Feb. 6, 2001); *Johnson v. Abramajtys*, No. 91-1465, 1991 WL 270829 at *9 (6th Cir. Dec. 17, 1991). Moreover, shortly after the Sixth Circuit decision in *Bagby*, the Supreme Court emphasized that the fact that an instruction was allegedly incorrect under state law is not a basis for habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6 (1983)). Instead, the only question on habeas review is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 14 (1973)); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same). If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law. *Id.*

As the state court held, each of Petitioner's claims of instructional error is patently without merit. Petitioner has not identified any lesser included offense that would have been appropriate on the facts of the case, and the trial court concluded that the facts would support no such lesser offense. (See 5/3/02 Cir. Ct. Ord. at 15; docket #56.) In addition, the prosecution did not introduce character evidence at trial, but merely challenged Petitioner about the inconsistencies in his testimony. Finally, the description of the prosecution's theory, taken in the context of the overall instructions, was not erroneous.

Moreover, even if an instructional error existed as a matter of state law, it patently did not so infuse the trial with unfairness as to rise to the level of a due process violation. *See Estelle*, 502 U.S. at 75. As a result, Petitioner cannot demonstrate actual prejudice from the failure to object at trial or to present the claim on direct review. The claim therefore is not cognizable on habeas review. *Id.*

V.      Failure to Grant Continuance

Petitioner next claims that he was denied his right to compulsory process and to the effective assistance of counsel when the trial court refused to allow a continuance of the trial date to enable Petitioner to obtain the presence of his endorsed witnesses. This fifth ground for relief is related to Petitioner's first habeas ground, which challenged the trial court's refusal to allow counsel to withdraw. Petitioner raised the first ground for habeas relief on direct appeal to the Michigan Court of Appeals. He did not, however, argue that the denial of the motion for continuance denied him due process and the effective assistance of counsel. Only in his application for leave to appeal to the Michigan Supreme Court did Petitioner introduce this argument. He did not renew his argument in his motion for relief from judgment.

Before the court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *See O'Sullivan*, 526 U.S. at 842; *Picard v. Connor*, 404 U.S. 270, 275-77 (1971) (cited by *Duncan v. Henry*, 513 U.S. 364, 365 (1995) and *Anderson v. Harless*, 459 U.S. 4, 6 (1982)). To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal

- 41 -

claims to all levels of the state appellate system, including the state's highest court. *Duncan*, 513 U.S. at 365-66; *Silverburg v. Evitts*, 993 F.2d 124, 126 (6th Cir. 1993); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990). "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845.

Petitioner has not properly exhausted his fifth ground for habeas relief. Presentation of an issue for the first time on discretionary review to the state supreme court does not fulfill the requirement of "fair presentation." *Castille v. Peoples*, 489 U.S. 346, 351 (1989). Applying *Castille*, the Sixth Circuit holds that a habeas petitioner does not comply with the exhaustion requirement when he fails to raise a claim in the state court of appeals, but raises it for the first time on discretionary appeal to the state's highest court. *See Hall v. Huffman*, No. 98-3586, 2000 WL 1562821, at *3 (6th Cir. Oct. 11, 2000); *Dunbar v. Pitcher*, No. 98-2068, 2000 WL 179026, at *1 (6th Cir. Feb. 9, 2000); *Miller v. Parker*, No. 99-5007, 1999 WL 1282436, at *2 (Dec. 27, 1999); *Troutman v. Turner*, No. 95-3597, 1995 WL 728182, at *2 (6th Cir. Dec. 7, 1995); *accord Parkhurst v. Shillinger*, 128 F.3d 1366, 1368-70 (10th Cir. 1997); *Ellman v. Davis*, 42 F.3d 144, 148 (2d Cir. 1994); *Cruz v. Warden of Dwight Corr. Ctr.*, 907 F.2d 665, 669 (7th Cir. 1990). Unless the state supreme court actually grants leave to appeal and reviews the issue, it remains unexhausted in the state courts. Petitioner's application for leave to appeal was denied, and, thus, the issue was not reviewed.

Accordingly, Petitioner's claim is not exhausted. Exhaustion is only a problem, however, if there is a state court remedy available for petitioner to pursue, thus providing the state courts with an opportunity to cure any constitutional infirmities in the state court conviction. *Rust*

*v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). If no further state remedy is available to the petitioner, exhaustion does not present a problem, but the claim is procedurally defaulted. *Id.* Here, Petitioner already has filed his one allowed motion for relief from judgment under MICH. CT. R. 6.502(G)(1). His claim, therefore, is procedurally defaulted.

As the Court previously has noted, if a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim "will result in a fundamental miscarriage of justice." *Hicks*, 377 F.3d at 551-52; *see Murray*, 477 U.S. at 495 (specifying that a 'fundamental miscarriage of justice' will result "where a constitutional violation has probably resulted in the conviction of one who was actually innocent.").

Petitioner may not rely upon the ineffective assistance of appellate counsel to excuse his default. To serve as cause to excuse the default, a claim of ineffective assistance of counsel must itself be properly exhausted. *Edwards*, 529 U.S. at 453; *Buell*, 274 F.3d at 349; *Coleman*, 244 F.3d at 538. Petitioner's claim of ineffective assistance of appellate counsel was not exhausted, since he failed to raise that claim at all levels of the state courts.

Petitioner also argues that his default should be excused because he is actually innocent of the charged crime. Innocence may excuse the exhaustion requirement only when the petitioner presents an extraordinary case. *See Schulp v. Delo*, 513 U.S. 298, 327 (1995); *Murray*, 477 U.S. at, 495-96; *Rust*, 17 F.3d at 162. Petitioner does not offer new evidence to show his innocence, and his claim consists of little more than a complaint that the jury should have believed his testimony, a question of credibility not reviewable in this court. The Court therefore finds that

- 43 -

Petitioner has not presented an extraordinary case excusing the failure to exhaust and subsequent procedural default. Petitioner's fifth ground for habeas relief therefore is procedurally defaulted.

Moreover, even were Petitioner entitled to review on the merits of his claim, the claim would fail. Under Supreme Court precedent, a denial of a motion for a continuance can be so arbitrary as to deny due process. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964); *Avery v. Alabama*, 308 U.S. 444, 446 (1940). The decision on this type of motion traditionally lies within the discretion of the trial judge, and not every denial violates due process, even if the party fails to offer evidence or is compelled to defend without counsel. *Id.* There are no "mechanical tests" for deciding when the denial is so arbitrary as to violate due process; rather, the Court must look to the circumstances of the case, particularly in the reasons presented to the trial judge at the time the request is denied. *Ungar*, 376 U.S. at 589.

The trial court carefully considered numerous factors in determining whether to deny the continuance. Among those factors was the extreme delay in the case, the prosecutor's right to a speedy trial, the presence of the jury to try the case on the date of the motion, the unavailability of a new trial date in the near future, the age of the victim, and, most importantly, Petitioner's own responsibility for causing the delay and the lack of preparation. (Tr. I, 19-20.) The trial court's denial of the request for continuance clearly was not so arbitrary as to violate due process.

In sum, Petitioner's fifth ground for relief is both procedurally defaulted and without merit. I therefore recommend that relief be denied on this ground.

VI.    Ex Parte Communications

Petitioner asserts that the trial court improperly engaged in *ex parte* communication with the jury in response to the jury's written question. His claim arises from an issue placed on the record by the trial court immediately following the jury verdict:

> THE COURT: I note for the record the jury has been discharged and has left. There's one point. The jury did submit one question during deliberations. It was shown to counsel, and it was responded to in writing by me. My understanding is that counsel agreed to the wording of the response I gave. Is that correct from the State's standpoint?
>
> MR. TALASKE: It is, your Honor.
>
> THE COURT: From the defense?
>
> MS. BOOHER: Yes, your Honor.
>
> THE COURT: Very well. I'll make sure that the question and the response will be made a part of the file.

(Tr. II, 143-44.) Petitioner now contends that the fact that he was not present when the court discussed the question with counsel renders the trial court's note to the jury an *ex parte* communication on a matter of substantive law.

As Respondent observes, Petitioner raised the claim for the first time in his motion for relief from judgment. Because both the court of appeals and the supreme court denied leave to appeal on the grounds that Petitioner failed to demonstrate entitlement to relief under MICH. CT. R. 6.508(D), the claim is procedurally defaulted. *See Munson*, 384 F.3d at 314; *Abela*, 380 F.3d at 923; *see also Hargrave-Thomas*, 374 F.3d at 388; *Simpson*, 238 F.3d at 407.

As cause excusing his default, Petitioner asserts that his claim is based on newly discovered evidence because he was unaware of the full content of the question and answer until

some later point. Petitioner fails to demonstrate cause.  It was apparent on the record on the date of the verdict that a message had been sent to the court by the jury and that counsel had met with the court and approved the response made to the jury.  Particularly where, as here, Petitioner personally submitted seven additional grounds for relief in a supplemental brief on appeal, he clearly was free to raise the instant claim at that time.  No grounds exist for considering the issue to be newly discovered.

Petitioner also asserts that appellate counsel was ineffective for failing to raise the claim. Petitioner, however, failed to raise a separate claim of ineffective assistance of appellate counsel in the state courts.  As a result, the claim of ineffective assistance of counsel is not exhausted.  To serve as cause to excuse the default, a claim of ineffective assistance of counsel must be properly exhausted.  *Edwards*, 529 U.S. at 453; *Buell*, 274 F.3d at 349; *Coleman*, 244 F.3d at 538. Moreover, even if Petitioner may be considered to have demonstrated cause by exhausting his claim of ineffective assistance of counsel, Petitioner has failed to demonstrate actual prejudice resulting from counsel's ineffectiveness.  Prejudice requires the Petitioner to show that the alleged error "worked to his *actual* and substantial disadvantage."  *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).  "'[T]he prejudice component of the cause and prejudice test is not satisfied if there is strong evidence of Petitioner's guilt and a lack of evidence to support his claim.'" *Perkins*, 58 F.3d at 219 (quoting *Rust*, 17 F.3d at 161-62).

Petitioner also has not demonstrated that manifest injustice would result because he has not made a colorable claim of innocence; he has not shown that any constitutional error "probably" resulted in the conviction of one who was actually innocent.  *Schlup*, 513 U.S. at 322 (citing *Murray*, 477 U.S. at 495).   This requires a showing that in light of the new evidence, no

juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt. *Coleman*, 244 F.3d at 540 (citing *Schlup*, 513 U.S. at 329). Accordingly, I conclude that Petitioner's prosecutorial misconduct claim is procedurally defaulted.

Further, even had Petitioner not defaulted his claim, he would not be entitled to relief. Petitioner has failed to identify any United States Supreme Court holding that a defendant has a constitutional right to be present for every discussion of a legal question between his attorney and the court. As the trial court noted in its lengthy discussion of Petitioner's motion for relief from judgment, "'[t]here is no constitutional reason why counsel and the court cannot confer about a question of law or procedure in the absence of the defendant.'" (5/3/02 Cir. Ct. Op. at 15, docket #56 (quoting *People v. Harris*, 224 N.W.2d 680, 687 (Mich. Ct. App. 1974)). The Supreme Court has recognized that a defendant may waive his right to be present at trial by voluntarily absenting himself at various points during an ongoing trial at which he has initially appeared, a limitation that subsequently was codified in the Federal Rules of Criminal Procedure. *See Diaz v. United States*, 223 U.S. 442, 457 (1912); Fed. R. Civ. P. 43(c). The *Diaz* Court recognized that it was not "consonant with the dictates of common sense that an accused person, being at large upon bail, should be at liberty, whenever he pleased, to withdraw himself from the courts of his country and to break up a trial already commenced." *Id.* (internal quotations omitted), *quoted in Crosby v. United States*, 506 U.S. 255, 260 (1993) (holding that Fed. R. Civ. P. 43(b) only permitted a defendant to waive the right to be present at trial after he has initially appeared for trial, and expressly declining to reach the constitutional question). The Sixth Circuit has recognized that the Supreme Court has left open the question of whether a defendant may constitutionally be tried in absentia when, after adequate notice, he voluntarily absents himself from appearing at trial. *See, e.g., Murr v. United*

- 47 -

*States*, 200 F.3d 895, 903 (2000) (recognizing that *Crosby* Court did not address whether trial in absentia was prohibited by the Constitution); *Kirk v. Dutton*, No. 94-5725, 1994 WL 561146, at \*2 (6th Cir. Oct. 11, 1994) (holding habeas relief not proper on argument that Petitioner was tried in absentia in violation of *Crosby*, because *Crosby* was decided under the Federal Rules of Criminal Procedure, not the Constitution).

As the Michigan Court of Appeals noted in *Harris*, 224 N.W.2d at 687, counsel commonly approach the bench during a trial to discuss something out of the hearing of the jury and, necessarily, out of the hearing of the defendant also. To avoid being overheard, the court and counsel may step into the chambers briefly. *Id.* No Supreme Court authority suggests that such a practice causes automatic reversal where no objection has been made and no prejudice is shown.

In sum, the trial court's application of law and findings of fact constituted clearly reasonable applications of Supreme Court precedent. *See* 28 U.S.C. 2254(D).

VII.   Sufficiency of the Evidence

In his seventh ground for habeas relief, Petitioner asserts that he was denied his Sixth Amendment right to a jury trial and his Fourteenth Amendment right to due process when he was convicted of the forgery offense on insufficient evidence. Once again, because Petitioner raised this issue for the first time in his motion for relief from judgment, the claim is procedurally defaulted. *See Munson*, 384 F.3d at 314; *Abela*, 380 F.3d at 923; *see also Hargrave-Thomas*, 374 F.3d at 388; *Simpson*, 238 F.3d at 407.

Assuming, however, that Petitioner could overcome his procedural default, the claim would be without merit. A § 2254 challenge to the sufficiency of the evidence is governed by the standards set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which

is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*  Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-402 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

Here, more than ample evidence existed from which a jury could have found Petitioner guilty.  First and foremost, had the jury merely believed victim's testimony, the evidence would have been sufficient to support the verdict.  The victim's testimony, however, was corroborated by numerous inconsistencies in Petitioner's story, the lack of receipts for the alleged payments for the transmission and its rebuilding, the out-of-sequence invoice numbers, the difference in the models listed on the purported receipt and the actual vehicle, and the difference between the automatic and manual transmissions. Constitutionally sufficient evidence unquestionably supported the jury's verdict.  Petitioner seventh ground for habeas relief therefore clearly is without merit.

VIII.    Conflict of Interest – Failure to Make Post-trial motions

Petitioner next argues that he denied the effective assistance of trial counsel when his attorney failed to file any post-trial motions between the date of the conviction, February 10, 1999, and the date of sentencing, April 19, 1999.  Although Petitioner's argument is somewhat unclear, Petitioner appears to contend that his attorney declined to file post-trial motions because she believed

she was not experienced with such motions and that the filing of post-trial motions would more appropriately be brought by appellate counsel, who would be appointed after sentencing. He therefore implies that trial counsel had a conflict of interest in protecting her own reputation. He also contends that his attorney had a conflict of interest in representing him after she moved before trial to withdraw because of the breakdown in communications with Petitioner.

Once again, Petitioner's claim was raised for the first time only in his motion for relief from judgment. Because both the court of appeals and the supreme court denied leave to appeal on the grounds that Petitioner failed to demonstrate entitlement to relief under MICH. CT. R. 6.508(D), the claim is procedurally defaulted. *See Munson*, 384 F.3d at 314; *Abela*, 380 F.3d at 923; *see also Hargrave-Thomas*, 374 F.3d at 388; *Simpson*, 238 F.3d at 407.

Further, Petitioner cannot demonstrate that the ineffective assistance of appellate counsel constituted cause for failing to raise the claim on direct appeal. As the circuit court noted in its opinion denying Petitioner's motion for relief from judgment, "[i]t is not ineffective assistance of counsel for the trial counsel's failure to file a motion for directed verdict of acquittal or a motion for new trial based on meritless claims." (5/3/02 Cir. Ct. Op. at 17; docket #56.) *See Buell*, 274 F.3d at 351. The trial court reasonably concluded that, in light of the substantial evidence against Petitioner and the lack of meritorious grounds for post-trial motions, motions would be futile. Moreover, as the trial court noted, after sentencing, appellate counsel would have 35 days to file a motion for directed verdict of acquittal or motion for new trial. As a consequence, even if trial counsel were ineffective no prejudice could be shown. (5/3/02 Cir. Ct. Op. at 17-18; docket #56.)

Finally, as I previously discussed, Petitioner has failed to set forth evidence demonstrating his actual innocence of the charged offense. *See Coleman*, 244 F.3d at 540 (citing

- 50 -

*Schlup*, 513 U.S. at 329) (holding that, to demonstrate actual innocence, a petitioner must show that in light of new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt).

For all of these reasons, I recommend that Petitioner's eighth habeas ground be denied as procedurally defaulted.

IX.    Due Process – Penalizing Exercise of Right to Trial

Petitioner asserts that his right to due process was violated when he was penalized for exercising his right to trial by the imposition of a fifteen-to-forty-year sentence, notwithstanding an earlier offer by the prosecutor of a plea agreement recommending a one-year sentence. The claim was raised for the first time in Petitioner's motion for relief from judgment.

As the Court previously has concluded, claims raised by Petitioner for the first time in his motion for relief from judgment are procedurally defaulted because both the Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal on the grounds that Petitioner had failed to demonstrate entitlement to relief under MICH. CT. R. 6.508(D).  *See Munson*, 384 F.3d at 314; *Abela*, 380 F.3d at 923; *see also Hargrave-Thomas*, 374 F.3d at 388; *Simpson*, 238 F.3d at 407.

Petitioner again raises as cause the ineffective assistance of trial counsel for failing to object at sentencing to the departure from the "PLEA CONTRACT recommendation," and the ineffective assistance of appellate counsel for failing to raise the claim on direct appeal. Petitioner has failed to demonstrate that either trial or appellate counsel was ineffective.  It is clear that Petitioner did not accept a plea offer.  Whether or not that plea offer was withdrawn at some point before trial and a different plea offer with a higher penalty was later offered, Petitioner still rejected

the plea offer and elected to proceed to trial. The Michigan Court of Appeals, in rejecting

Petitioner's claim that the prosecutor failed to honor a written plea agreement, found as follows:

> Defendant also claims the prosecutor failed to honor a written plea agreement. The record actually shows that the exact opposite occurred. The prosecutor offered defendant a plea agreement. Defendant chose not to accept the plea.

(11/17/00 MCOA Op. at 3.) The trial court reiterated the finding in its decision on the motion for

relief from judgment. (5/3/02 Cir. Ct. Op. at 18.) The trial court also held that the appellate court,

while addressing a related claim about the length of Petitioner's sentence, rejected Petitioner's

suggestion that the sentence was improperly imposed or biased:

> The trial court carefully considered the accuracy of the presentence report and the objections to it at the sentencing hearing, took into account a correction as to defendant's prior criminal record, and took pains to ensure that the correct number of convictions had been ascertained before sentencing defendant as an habitual offender. Imposing sentence, the court found that defendant had an extensive record, that he was a poor prospect for rehabilitation based on his history, and that defendant's crime amounted to fraud on an elderly and susceptible victim who placed confidence in him. Accordingly, defendant's sentence was not disproportionate. See *People v Milbourn*, 435 Mich. 630, 635-36; 461 NW2d 1 (1990).

(11/17/00 MCOA Op. at 3; 5/3/00 Cir. Ct. Op. at 12; docket #56.) As previously noted, factual

findings by the state courts are entitled to a presumption of correctness, whether they are made by

trial or appellate courts. 28 U.S.C. § 2254(e)(1); *Sumner*, 449 U.S. at 546; *Lancaster*, 324 F.3d at

429; *Bailey*, 271 F.3d at 656; *Smith*, 888 F.2d at 407 n.4. Petitioner fails to introduce evidence

sufficient to overcome that presumption of correctness. Indeed, Petitioner does no more than assert

that the sentencing court penalized him for the exercise of his right to trial. As the trial court

observed:

> Unfounded and unsupported allegations against the Court and the Prosecuting Attorney regarding the alleged plea agreement and the Court's alleged involvement in the plea agreement do not form the basis for showing that the Court penalized the

Defendant for seeking a jury trial and for requesting to withdraw his plea in the larceny case.

(5/3/00 Cir. Cit. Op. at 12.)  The trial and appellate courts' determinations are patently reasonable. Because no evidence exists that the trial court penalized Petitioner for the exercise of his trial rights, no basis exists for concluding that counsel was ineffective for failing to challenge the sentence on those grounds. *Smith*, 477 U.S. at 536.

X.    Sentence Based on Inaccurate Information

Petitioner next complains that his sentence as a fourth habitual offender was based on inaccurate information because one of the prior convictions allegedly relied upon by the sentencing court had previously been dismissed, ostensibly in violation of his Fourth, Fifth, Sixth and Eighth Amendment rights. In his appeal of right, Petitioner raised a similar claim, contending that his counsel was ineffective for failing to object to inaccurate sentencing information.  The court of appeals rejected the claim, as previously discussed in section IX of this report and recommendation. Petitioner then raised the ineffective assistance of counsel claim in his application for leave to appeal to the Michigan Supreme Court.

In his motion for relief from judgment, Petitioner raised for the first time the precise claim now presented on habeas review.  Both the Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal on the grounds that Petitioner had failed to demonstrate entitlement to relief under MICH. CT. R. 6.508(D).  As a result, the claim is procedurally defaulted and Petitioner must show cause and prejudice excusing the default.  *See Munson*, 384 F.3d at 314; *Abela*, 380 F.3d at 923; *see also Hargrave-Thomas*, 374 F.3d at 388; *Simpson*, 238 F.3d at 407.

- 53 -

Petitioner contends that the ineffective assistance of trial counsel in investigating the prior convictions and appellate counsel in failing to raise the claim on direct appeal serve as cause excusing his default. However, as I previously have noted in Section IX of the instant report and recommendation, the court of appeals previously found on direct review that counsel was not ineffective at sentencing. (11/17/00 MCOA Op. at 3; 5/3/00 Cir. Ct. Op. at 12; docket #56.) The court of appeals' determination constitutes a clearly reasonable application of clearly established Supreme Court precedent. *See Strickland*, 466 U.S. at 687-88 (requiring showing that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome).

Moreover, even were Petitioner able to demonstrate cause and prejudice excusing his default, he would not be entitled to relief in this Court. A court violates due process when it imposes a sentence based upon materially false information. *United States v. Tucker*, 404 U.S. 443, 447-49 (1972); *Townsend v. Burke*, 334 U.S. 736, 740 (1948) (citation omitted). Petitioner has the burden of demonstrating "first, that the information before the sentencing court was false, and, second, that the court relied on the false information in passing sentence." *United States v. Stevens*, 851 F.2d 140, 143 (6th Cir. 1988) (citations omitted).

In his motion for relief from judgment, Petitioner asserted that he received newly discovered evidence to the effect that a Supplemental Habitual Information containing inaccurate information was filed by the prosecuting attorney and was relied upon at sentencing. The trial court rejected the claim, finding no indication that the document had been before the court at the time of the sentence. Further, the court concluded that the transcript revealed that the court explicitly addressed at sentencing each of the convictions Petitioner now claims previously had been

dismissed. According to the trial court, the record reflected that the court had explicitly refused to rely upon one charge that had been dismissed and recognized that another had been reduced to a misdemeanor. As a result, the court concluded that Petitioner had failed to show that the convictions were inaccurate or that the court had relied upon inaccurate information in sentencing. (5/3/00 Cir. Ct. Op. at 4.) It further concluded that the record showed the existence of sufficient prior convictions to sentence Petitioner as a fourth habitual offender. *Id.*

The trial court's findings were carefully made and are entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(e)(1); *Sumner*, 449 U.S. at 546; *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656; *Smith*, 888 F.2d at 407 n.4. Petitioner has failed to introduce evidence sufficient to rebut that presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Finally, the record wholly supports the conclusion of the court of appeals that counsel had properly acted to correct the presentence report at the sentencing hearing. The court unequivocally concluded that Petitioner's own behavior was responsible for any other breakdowns in communication between counsel and Petitioner:

> As for assistance of counsel, we have noted that earlier difficulties in the attorney-client relationship were defendant's fault, not his attorney's. The record indicates that defendant continued his uncooperative attitude toward counsel through the sentencing stage of proceedings. Nevertheless, his attorney did an effective job of representation, pointing out an error in the presentence report, and asking the court to exercise leniency toward defendant because of his family support and his prospects for rehabilitation.

(11/17/00 MCOA Op. at 3.) The factual determinations made by the court of appeals are presumptively correct and Petitioner has failed to present clear and convincing evidence to rebut

them. 28 U.S.C. § 2254(e)(1). For all the stated reasons, I recommend that Petitioner's tenth ground for habeas relief be denied as both procedurally defaulted and without merit.

XI.   <u>Ineffective Assistance of Trial Counsel</u>

Petitioner next asserts that he received ineffective assistance of counsel when the trial court refused to allow counsel to withdraw on the opening day of trial and refused to allow a continuance. Petitioner also asserts that counsel was ineffective for failing to file any pretrial motions or post-trial motions. Petitioner raised a portion of this claim tangentially in his first issue on direct appeal, which directly challenged the trial court's denial of counsel's motion to withdraw. He also raise a portion of the claim in his motion for relief from judgment challenging the lack of post-trial motions. Further, he raised a challenge to the trial court's denial of the motion for continuance in his application for leave to appeal to the Michigan Supreme Court on direct review, which again tangentially attacked the performance of counsel. Finally, a portion of the claim is that counsel was ineffective for failure to object to repeated prosecutorial misconduct, a portion of which was raised on direct appeal.

All portions of Petitioner's claim have previously been addressed in this report and recommendation in response to the separate grounds for habeas relief. As I have noted, most of those claims are procedurally defaulted and the remainder are without merit. For the previously stated reasons, I recommend that Petitioner's eleventh ground for habeas relief be denied.

XII.   <u>Cumulative Error</u>

In his final habeas ground, Petitioner argues that even if all of the errors he asserts are considered to be individually harmless, their cumulative effect tainted the trial to the extent that his due process rights were violated. First, as a practical matter, I previously have found no errors

- 56 -

that could be aggregated to demonstrate cumulative error. Further, although Sixth Circuit precedent supports the proposition that errors that are harmless in isolation may require reversal when taken together, *see United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000); *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir.1983), no United States Supreme Court precedent recognizes the cumulative error doctrine. Under the AEDPA, a court only may grant habeas relief based on a misapplication of Supreme Court law. *Bailey*, 271 F.3d at 655. Both because he has failed to demonstrate any errors to aggregate and because his claim depends on non-Supreme Court precedent, Petitioner is not entitled to habeas corpus relief on this ground. *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004).

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  May 19, 2005          /s/ Hugh W. Brenneman, Jr.
                              Hugh W. Brenneman, Jr.
                              United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).